IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2019

## JONATHAN ALAJEMBA v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. 75357     David M. Bragg, Judge**

_____

### No. M2018-01470-CCA-R3-PC

_____

The Petitioner, Jonathan Alajemba, filed a petition for post-conviction relief from his convictions of facilitation of conspiracy to commit especially aggravated robbery, attempted especially aggravated robbery, attempted voluntary manslaughter, aggravated assault, reckless aggravated assault, and aggravated burglary. The Petitioner alleged that his trial counsel was ineffective by persuading the Petitioner not to testify and failing to present proof of an insanity defense. He further alleged that newly discovered evidence in the form of recanted testimony established he did not intend to commit robbery. The post-conviction court denied the petition, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brock East (on appeal and at trial) and C. Benjamin Lewis (at trial), Murfreesboro, Tennessee, for the Appellant, Jonathan Alajemba.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jennings Hutson Jones, District Attorney General; and Trevor H. Lynch and Shawn Puckett, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The Petitioner was convicted for offenses that occurred during the attempted robbery of Tommy Moss by the Petitioner and co-defendants Coty Heath[1] and Bobby Joel (B.J.) Wilson on the night of December 9, 2008. During the offense, Moss was killed, and three other occupants of the house, Kaitlynn Kennedy, David Tompson, and Jeff Fogle, were injured.

"Disposition of the [Petitioner's] charges resulted from two separate trials, occasioned by mistrials on some of the charges at the conclusion of the first trial." State v. Jonathan Alajemba, No. M2013-00968-CCA-R3-CD, 2014 WL 5840369, at *1 (Tenn. Crim. App. at Nashville, Nov. 12, 2014). At the initial trial, Fogle testified that he was living at Moss' house with Moss, Tompson, Kennedy, Shawn Sherfield, and Randy Mansell. Id. at *4. Fogle said that on the afternoon of December 9, 2008, he and Tompson were in the kitchen cooking hamburgers when he heard shots. Id. Fogle turned and saw B.J. Wilson pointing a gun at him. Id. at *4. Fogle got down and told Wilson "'he didn't have to do this,'" but Wilson shot him. Id. Fogle saw Wilson "'messing with his gun'" and grabbed Wilson to try to get the gun from him. Id. Fogle yelled for help, and Mansell came into the kitchen and helped him. Id. After a struggle, Fogle went into a nearby bathroom and called 911 for help. Id. Fogle acknowledged that Mansell and Moss each owned a handgun. Id.

Tompson testified that while he and Fogle were in the kitchen, three men wearing hoodies came into the house and asked for Mansell. Id. Moss responded that Mansell might be in the back of the house, and Fogle said that Mansell was in his room. Id. The three men went into Mansell's bedroom, and when they emerged, one of the men stopped in the kitchen, and the other two walked into the living room. Id. Tompson continued to cook, but he heard something that sounded like thunder and glass shattering. Id. at *5. The man in front of Tompson and Fogle removed the hood from his head and pointed a gun at Fogle. Id. Tompson heard gunshots, and the man shot Fogle. Id. Tompson ducked then stood up, and the man shot Tompson in the head. Id. Tompson tried to run away but was shot in his right side, in the back, and a bullet grazed his forehead. Id. Tompson told the police that one of the men was Caucasian and that he assumed the two other men were also Caucasian. Id. Tompson identified the man who shot him and Fogle from a photograph lineup but was unable to identify the other two men. Id.

Kennedy testified that around noon on the day of the offense, the Petitioner came to Moss' house around noon to see Mansell. Id. The Petitioner left after Kennedy told him Mansell was not at home. Id. Three or four hours later, the Petitioner returned with a white man whom Kennedy did not know, and the Petitioner bought marijuana from

---

[1] Coty Heath and his brother, Dustin Heath, both testified at the post-conviction hearing. For clarity, we have chosen to use the first names of these witnesses. No disrespect is intended.

Kennedy. Id. The Petitioner acted "'weird'" when Kennedy again told him Mansell was not home. Id. Near 9:00 p.m., the Petitioner returned to Moss' house with two white men. Id. at *6. Mansell was at home, and the Petitioner went into Mansell's bedroom. Id. Shortly thereafter, the Petitioner and one of the men walked into the living room and talked with Moss. Id. The Petitioner pulled out a gun, said he had obtained it recently, and handed it to Moss for his examination. Id. Moss looked at the gun then returned it to the Petitioner. Id. The Petitioner asked Kennedy if she had any more marijuana. Id. After she said no, the Petitioner shot Moss then shot Kennedy twice. Id. After he was shot, Moss ran through a glass door. Id. Kennedy stated that "'gun fire just followed with horrifying screams. You could tell that this was a massacre. And I did not know what was going on. It was just gun fire and screams.'" Id. Kennedy said that Moss did not show or display a firearm to the Petitioner on the night of the offense. Id. at *7. Kennedy identified the Petitioner from a photograph lineup as the person who shot her and Moss. Id. She also identified the two white males who were with the Petitioner on the night of the shooting. Id.

Wilson testified that on the day of the offense, Coty called and said that he knew where they could get marijuana and asked Wilson to meet him and bring a gun. Id. at *8. Wilson met Coty and the Petitioner at McDonald's. Id. The men got into Wilson's car, and Wilson asked whom they planned to rob and what they planned to take. Id. Coty said that they would rob Moss, who had marijuana, and the Petitioner said that Moss had $10,000 he had saved for a music promotion party. Id. The Petitioner showed Wilson that he had a .357 gun in a shoulder holster. Id. After they arrived at Moss' house, Wilson got out of the car, put his gun in his waistband, and gave the Petitioner money. Id. Wilson went into the kitchen and stayed until he heard gunshots. Id. at *9. He then he shot at the two men in the kitchen. Id. Wilson struggled with one of the men over Wilson's gun, and Wilson ran outside. Id. Wilson saw that his car was gone. Id.

Coty testified that on December 8, 2008, he was released from a juvenile detention facility. Id. The next morning, the Petitioner came to Coty's house and said that he had recently obtained a .357 revolver. Id. The Petitioner said that he knew someone named Moss who had marijuana and money and that he wanted to steal the marijuana. Id. The Petitioner asked Coty to join him, but Coty initially declined. Id. The Petitioner said he would try to recruit Marcus Johnson to assist in the crime. Id. Later that day, Coty contacted the Petitioner to find out if he had committed the crime. Id. Upon discovering that he had not, they met at Coty's house and discussed the robbery. Id. Coty called Wilson and asked if he wanted to help rob someone for marijuana. Id. Wilson was interested, and the three men met at McDonald's. Id.

Afterward, they left the restaurant and drove to Moss' house. Id. at *10. Coty said that "[t]he plan was for the [Petitioner] 'to stick up Moss and pull the gun on him.

- 3 -

And [Wilson] was supposed to hold the gun on whoever else was in the house. And [Coty] was just supposed to get the [marijuana] or whatever they had.'" Id. Coty thought that "'something went wrong,'" and the Petitioner shot Moss two or three times. Id. Coty did not see the first gunshots. Id. Coty was "'spooked'" by the gunshots and grabbed the marijuana before leaving the house. Id. Coty saw the Petitioner standing over Kennedy, and he also saw Wilson shooting toward two people in the kitchen. Id. Coty acknowledged that he initially lied to the police when he said he remained in the car while Wilson and the Petitioner went into Moss' house. Id. at *11. He explained that he had wanted to avoid a felony murder charge for taking the marijuana but maintained that he was telling the truth at trial. Id. Coty said that the Petitioner told him, "'[Y]ou better not testify against me. You know, I can do the rest of my life in jail . . . .'" Id.

Johnson testified that the Petitioner tried to recruit him to help with a robbery, but he declined. Id. The Petitioner said that he needed money to pay a car note, and he showed Johnson his .357 revolver. Id. The Petitioner said that "'he was going to go back and rob that old dude,'" and he asked if Johnson would "'ever be with him when he killed somebody. [Johnson] said no. [The Petitioner] said why not. He wanted [Johnson] to be there. [Johnson] told him, no, [he] couldn't do that.'" Id. After the offense, the Petitioner called Johnson and told him that "'it was a robbery gone wrong.'" Id.

Murfreesboro Police Detective Paul Mongold testified that the Petitioner was interviewed at the police station on December 10, 2008. Id. at *13. After the interview, the Petitioner was incarcerated. Id. During his incarceration, he sent a note to Detective Mongold that he wanted to make a statement about the case. Id. On December 22, 2009, Detective Mongold interviewed the Petitioner again, and the Petitioner gave a four-page written statement, which stated in pertinent part:

> "So we walk to the house and I knock on the storm door and Moss opens up the front door and sees me and lets us in so we walk inside I walked towards the kitchen seen Rerun and Jeff [Fogle] and stood next to the couch and [Wilson] & Coty stood to the left and back of me by the stairs. I give [Kennedy] a $20 bill and told her to give me a dub. So she weighs the weed and bags it up and gives it to me. Then [Wilson] asked Moss where is Buck and Moss says he's asleep. Then me and Moss started talking about misc. things like his nephew, weed and his promotion party he was having. . . . Moss pulls out a gun from somewhere. I'm not fully sure where it came from and puts a clip in it and starts pointing it towards me without saying a word. So I then shot him in the chest area twice then I see [Kennedy] move to my

- 4 -

right so I turn to her and I see her dig into the couch and pulls out a small chrome looking gun so I remember shooting her twice then I look towards Moss and he is running towards the door and I shot again and the storm door shatters and he runs outside and I move in front of the coffee table and I see Moss running then he falls face down in the ground then I went outside and stood over Moss's body for a few seconds and to my left Re-run runs out from the back of the house running towards the front and he runs to [Wilson's] parked car and falls down by the passenger side door. . . ."

Id. at *14.

The Petitioner was convicted of facilitation of conspiracy to commit especially aggravated robbery; attempted especially aggravated robbery; attempted first degree murder; two counts of attempted voluntary manslaughter; aggravated assault; two counts of reckless aggravated assault; and aggravated burglary. Id. at *1, 14, and 28. The jury was unable to reach a verdict on one count of second degree murder and three counts of first degree felony murder, and a second trial was held on those charges. The Petitioner was convicted as charged. The proof at the second trial was largely consistent with that at the first trial. Id. at *27-28. Coty added that no one was supposed to get killed or hurt during the robbery. Id. at *27. The Petitioner did not testify at either trial. Id. at *14, 28. On direct appeal, this court held that the evidence was insufficient to sustain the Petitioner's convictions of aggravated burglary and first degree felony murder in the perpetration or attempted perpetration of a burglary. Id. at *1. Accordingly, this court reversed the convictions. Id. The judgments were affirmed in all other respects, resulting in an effective sentence of life plus twenty-nine years. Id. at *38.

Thereafter, the Petitioner filed a pro se petition for post-conviction relief. Counsel was appointed, and two amended petitions were filed. The Petitioner alleged in pertinent part that his trial counsel was ineffective by advising him not to testify at trial and by not presenting proof of an insanity defense. The Petitioner also alleged that Coty would recant his trial testimony and establish that the Petitioner did not intend to commit a robbery.

At the beginning of the post-conviction hearing, the State objected to the admission of any recanted testimony, arguing that Tennessee appellate courts have held that recanted testimony is essentially an issue of sufficiency of the evidence, which is not a cognizable issue in a post-conviction proceeding. The post-conviction court agreed with the State that the Petitioner was not entitled to relief in a post-conviction proceeding

due to recanted testimony, but the court said it would allow the Petitioner to make an offer of proof on the issue.

The Petitioner testified that trial counsel "coerce[d]" him not to testify at trial by giving him "bad advice." The Petitioner told trial counsel he thought his testimony was necessary, particularly regarding self-defense.

The Petitioner explained that until two weeks before the offense, he was a member of the Gangster Disciples. Due to internal gang issues, he decided to switch to a rival gang, the Vice Lords. The Petitioner was "vocal" about his reasons for changing allegiances. The Gangster Disciples' leadership became upset with him and issued an order for any member to try to kill him on sight.

The Petitioner said that on the night of the offense, Coty called the Petitioner and said that Wilson wanted to buy marijuana. The Petitioner said, "Bobby Wilson is a timid individual. He is a Caucasian individual. The area that – where the weed was, was a predominantly black place. He was scared to go by himself. So he asked that I go for him and buy the weed for him." The Petitioner said that he agreed and that he planned to "take Bobby's money, and [the Petitioner] would charge Bobby a higher price than what the weed was. So, [the Petitioner] was making money [him]self." Three of the people at the residence where the Petitioner went to purchase marijuana were Gangster Disciples. The Petitioner acknowledged that he was aware of their gang affiliation before he went to the residence, that he feared for his safety and took a firearm with him, and that he went despite the danger "[f]or the money."

Wilson and Coty went with the Petitioner to the residence. The Petitioner purchased a small amount of marijuana and handed it to Wilson for his approval. Meanwhile, the Petitioner and Moss, a Gangster Disciple, began arguing about the Petitioner's leaving the gang. The Petitioner said that after he "used a few choice words towards" Moss, Moss reached toward his waistband. The Petitioner thought Moss was reaching for a gun, so he drew the gun from the holster at his waist and shot Moss. The Petitioner acknowledged that he never saw Moss pull out a gun. The Petitioner said that he saw Kennedy, a "Crip" gang member, reach under the couch cushions in an "odd" manner. The Petitioner thought he saw her start to pull out a gun, and he shot her. After she fell to the floor, a silver and pink gun fell to the floor beside her. The Petitioner left the residence, and he was arrested the next morning.

The Petitioner said that after he explained the foregoing to trial counsel, they discussed the possibility of the Petitioner testifying that he acted in self-defense. Trial counsel advised the Petitioner not to testify because his prior convictions could be used against him. The Petitioner told trial counsel that he "didn't think that would matter."

- 6 -

Trial counsel also advised the Petitioner that "the gang stuff is not going to work. Rutherford County, Murfreesboro, these people don't care about gangs. They will be glad that you killed him, and they'll be happy to send you to prison for it."

The Petitioner acknowledged that he relied on trial counsel's advice and chose not to testify. The Petitioner said, "I don't know why I relied on him. I shouldn't have. At the time he made it seem like it was the best thing to do." The Petitioner did not believe trial counsel provided "fair or competent advice." The Petitioner said that if given the opportunity, he would have testified at trial.

The Petitioner explained that he wrote a statement detailing his involvement in the offenses after he had spent a year in the Rutherford County Jail following his arrest. He spent the entire time in jail in solitary confinement, which detrimentally affected his mental state and left him willing to "say anything to get out. If it would get me from – get out of jail and go to prison, I didn't care."

The Petitioner said that before his incarceration, he had been hospitalized eight times for mental health issues, including "schizophrenia, hearing voices." He informed trial counsel about his mental health issues, and trial counsel filed a "motion for psychological services." Dr. Lynne Zager was appointed, but Dr. Zager never reviewed the Petitioner's medical records, never interviewed him, and never visited him. Trial counsel told the Petitioner that Dr. Zager reviewed the Petitioner's police interview and thought the Petitioner was "okay." Trial counsel told the Petitioner that Dr. Zager could be used as a mitigation witness during sentencing, but she did not testify at the sentencing hearing.

On cross-examination, the Petitioner acknowledged that he had two trials on the charges. He maintained that if he had testified at either trial, his testimony would have been that he feared retaliation from the Gangster Disciples for leaving the gang and that he shot Moss, a Gangster Disciple, because he thought Moss was reaching toward his waistband for a weapon.

The Petitioner agreed that when he initially was interviewed by law enforcement, he said that he was not present at the residence and knew nothing about the incident. He again was untruthful in his four-page written statement, notably failing to mention any gang involvement. The Petitioner agreed that in his written statement, he said that he handed his loaded firearm to Moss and offered to sell it to him. The Petitioner maintained that a portion of the statement was accurate, explaining that he and Moss had not yet started arguing. The Petitioner acknowledged he had not mentioned that detail in his direct testimony, explaining, "[T]here was a lot of things that happened in the house that I left out. You know, I forget things." The Petitioner acknowledged that in his

- 7 -

statement, he said Moss "actually pulled out a gun and started to put a clip in it," but that Moss had merely reached toward his waistband. The Petitioner explained that he did not intend to lie in his statement but that he made a mistake and wrote the statement when he "was mentally unstable. . . . I made a lie up when I was sick in the head."

The Petitioner was not concerned that the jury might have problems with changes in his story, noting, "It doesn't matter what it sounds like, as long as it's the truth." The Petitioner acknowledged that he had a previous conviction of burglary. The Petitioner contended that Wilson and Coty lied at trial.

The Petitioner agreed that during both trials, the trial court questioned him about whether he wanted to testify and that he informed the trial court he did not want to testify. The Petitioner further agreed that he had "every opportunity" to tell the trial court that he wanted to testify despite trial counsel's advising him against it.

Trial counsel testified that he had been an attorney since 1982 and that he had tried many criminal cases. By the time trial counsel was appointed to represent the Petitioner in January 2010, the Petitioner had spoken with law enforcement on two occasions. Trial counsel was especially concerned about the statement the Petitioner gave in December 2009 "that allowed the State to essentially put him [at the crime scene] by his own words." Trial counsel filed a motion to suppress the statement, arguing that the Petitioner had been in jail for a long time and had significant psychological issues. The trial court denied the motion to suppress, and the denial was affirmed on direct appeal.

Trial counsel stated that he obtained the Petitioner's psychological records and that following an evaluation, the Petitioner was found competent to stand trial. Subsequently, trial counsel asked Dr. Zager to evaluate the Petitioner and potentially testify as a mitigating witness at the sentencing hearing. Dr. Zager confirmed that the Petitioner was competent to stand trial and determined "that it would not be wise on [trial counsel's] part to call her as a witness at the sentencing hearing." Trial counsel discussed the evaluations with the Petitioner on many occasions.

After the second trial, trial counsel again talked with the Petitioner about the possibility of having Dr. Zager testify at the sentencing hearing, but he did not recall what the Petitioner said. Trial counsel said Dr. Zager was clear that on cross-examination, she would give her truthful assessment of the Petitioner, which was that she thought he would reoffend if he were released. Trial counsel stated that Dr. Zager's testimony would not have been favorable to the Petitioner. Trial counsel did not recall relaying this information to the Petitioner specifically but was "sure" he did.

Trial counsel stated that his clients often failed to follow his advice and that the Petitioner did not comply with all of his advice, such as not speaking with other inmates. Trial counsel advised the Petitioner not to testify because (1) the State would have the opportunity to cross-examine him; (2) the State would be able to use his prior criminal record against him; and (3) he "would not make a very good witness, even though he truly believes that he would." Trial counsel said that in his experience, many defendants did not do well when subjected to cross-examination by a "skilled" prosecutor. Given the Petitioner's prior convictions, trial counsel was concerned about exposing the Petitioner to cross-examination. Trial counsel noted that the Petitioner had given the police a four-page written statement because he thought "that he could talk his way out of it" and that the Petitioner thought he would be a good witness for the same reason. Trial counsel did not think the Petitioner would be a good witness because his versions of events were inconsistent with each other and "with the base facts of the case." Trial counsel warned the Petitioner that the State would "pick [him] apart on any inconsistencies" in his versions of events. Trial counsel also advised the Petitioner about "the pluses and the minuses [of testifying]. And generally the minuses far outweigh [the] pluses." Nevertheless, trial counsel left the decision of whether to testify to the Petitioner. At both trials, a <u>Momon</u> hearing was conducted, and the Petitioner chose not to testify.

Trial counsel explained that the Petitioner's versions of events kept changing, and trial counsel had ethical concerns about allowing the Petitioner to testify. He contacted the disciplinary board for advice on how to proceed. Trial counsel never told the Petitioner that he would have to withdraw from the Petitioner's case but explained that the trial court ultimately would decide whether trial counsel should withdraw. Trial counsel recalled that he also contacted the disciplinary board after the Petitioner threatened him with physical harm. He said the threats did not cause him to be biased against the Petitioner and did not impact his advice that the Petitioner should not testify.

Trial counsel said that the Petitioner told him about his gang affiliation. Trial counsel thought the Petitioner's gang affiliation might cloud the jury's judgment of the Petitioner. Accordingly, trial counsel did not want the gang affiliation mentioned at trial and filed a motion in limine to exclude it. The trial court granted the motion, which prevented any mention of the Petitioner's gang involvement "unless we made it an issue. In other words, if [the Petitioner] testified, that was coming out – was another factor to come into it, too." Trial counsel did not recall if the Petitioner mentioned that he had transitioned from one gang to another shortly before the offenses but acknowledged it was possible. Trial counsel did not recall the Petitioner ever saying that he was a "target" because of his transfer from the Gangster Disciples to the Vice Lords. Trial counsel explained that the most important issue at trial was to establish that Moss had a gun.

- 9 -

Trial counsel said that in the Petitioner's first trial, they used the statement the Petitioner gave to the police in December to pursue the self-defense theory. Trial counsel thought the "incompetence" of some of the State's witnesses also helped to establish the Petitioner's claim of self-defense. Trial counsel opined that "[e]verybody involved" with the offenses "had trouble with the truth," which he believed he conveyed to the juries. Notably, trial counsel said that Coty and Wilson were "pathological liars," which was evident to the juries.

On cross-examination, trial counsel stated that generally, all criminal defendants wanted to testify. He advised his clients of the advantages and disadvantages of testifying and cautioned them that most prosecutors could "make mincemeat out of them" on cross-examination. Regardless, trial counsel always allowed his clients to make the ultimate decision on whether to testify.

Trial counsel noted that Coty's first statement to the police reflected that he was not at the scene and had nothing to do with the offense and that "every time he testified it was different." Trial counsel cross-examined Coty about the inconsistencies in his versions of events. Trial counsel agreed that his primary focus and strategy was to cross-examine the State's witnesses on their inconsistent statements.

Trial counsel acknowledged that the Petitioner initially told the police that he was not at the scene and had nothing to do with the crime. However, the State obtained video footage of the Petitioner with Coty and Wilson at McDonald's immediately prior to the homicide. Thereafter, the Petitioner contacted law enforcement and gave a detailed, four-page statement, which trial counsel moved to suppress. After the trial court ruled the statement was admissible, trial counsel used the statement as the "building block" for the self-defense theory. According to the statement, Moss expressed interest in purchasing the Petitioner's gun, and the Petitioner gave the gun to Moss to examine. After the examination, the Petitioner put the gun back in his holster. Moss pulled out a different gun, slid a magazine into the gun, and pointed the gun in the Petitioner's direction. The Petitioner felt he was in danger and shot Moss. Trial counsel noted that "a magazine was found at the scene that matched that gun. But we never could find the gun."

Trial counsel said that he did not recall the Petitioner's telling him that "[h]e showed Mr. Moss his gun, he got his gun back, and then there was this argument over the weed, but then Mr. Moss just reached for his waistband, and he didn't know what he was going for, and he shot him[.]" Trial counsel opined that the Petitioner's testimony at the post-conviction hearing was yet another version of events and would have made self-defense harder to establish because the Petitioner did not see a weapon, merely someone reaching toward his waist. Trial counsel said that he advised the Petitioner against testifying because the State would have easily dismantled the inconsistencies in his story.

- 10 -

Trial counsel said that he obtained funds for an expert evaluation of the Petitioner's mental health issues and hired Dr. Zager. Dr. Zager told trial counsel that "she would not be an effective witness." Trial counsel told the Petitioner that Dr. Zager's testimony would not be favorable, and trial counsel and the Petitioner decided she should not be called as a witness at trial or sentencing.

The Petitioner was recalled in rebuttal. The Petitioner said that after he told trial counsel he wanted to testify, trial counsel responded that the Petitioner had given trial counsel several different statements and that trial counsel could not "put [the Petitioner] on the stand and direct [him] during the trial." Trial counsel told the Petitioner that he was going to contact the disciplinary board for advice on how to proceed. A couple of days later, trial counsel told the Petitioner that he would be unable to continue representing the Petitioner if he chose to testify. The Petitioner said that trial counsel told him, "I can't be no part of perjury." The Petitioner said that trial counsel also said that if the Petitioner insisted on testifying, he would have to make a statement without being asked questions by trial counsel. The Petitioner said that after this conversation, he felt that "[t]he only choice I had was not to testify."

As an offer of proof, Coty testified that he was incarcerated for facilitation of the second degree murder of Moss. Coty said that he and the Petitioner were friends and that on the day of the offense, they "hung out" with Wilson before going to Moss' residence to buy marijuana. Coty said that "[t]here was no plan, no intent" to rob anyone that evening. Coty acknowledged he knew the Petitioner had a gun that night, but he did not ask the Petitioner why he had the weapon because it was not "out of the ordinary."

Coty said that he had never been to Moss' residence before that day but that it was well-known that Moss sold marijuana. Coty did not interact with anyone at Moss' residence. Coty said that he and Wilson were standing behind the Petitioner when the Petitioner and Moss began "arguing kind of aggressive." Coty and Wilson were talking when Coty heard a gunshot. Coty did not know who "drew first," noting that he did not see either the Petitioner or Moss pull a weapon. After hearing the first gunshot, Coty ran from the scene. Coty said that Kennedy "might have had" a gun and that a gun was recovered from the crime scene.

Coty said that before the Petitioner's trial, the State prepared him to testify. Coty asserted that the State had not made any plea offers in exchange for his testimony and that the State never suggested that he needed to testify that "this was a robbery." He further asserted, "I told [the State] at trial it wasn't a robbery. It wasn't planned. . . . There were no demands for nothing. Nobody demanded nothing. Like I said, we went there to buy some weed."

- 11 -

On cross-examination, Coty said that he was seventeen years old at the time of the offense. Initially, while his case was in juvenile court, Coty told the State that he had nothing to do with the offense and that he knew nothing about it. Coty acknowledged that throughout the prosecution of his case, he gave the police a couple of false statements, explaining that he was a "kid" and "[s]cared." Coty acknowledged that he had testified on two occasions in front of two juries and that to his knowledge, he did not lie during his testimony.

On redirect examination, Coty said that he did not remember testifying at trial that the Petitioner was the one who had the idea to rob someone for marijuana or that the "plan was to . . . stick up Moss and pull the gun on him, and [Wilson] was supposed to hold the gun on whoever else was in the house, and [Coty] was supposed to get the weed or whatever they had."

Dustin Heath, Coty's brother, testified that he knew the Petitioner prior to the offenses and knew that the Petitioner had changed his gang affiliation just prior to the offenses. Dustin said that a gang member was often killed after changing gang affiliations. After the Petitioner and Coty were arrested, Dustin received telephone calls that caused him to fear for his safety. He said that people came by his house late at night and that on one occasion, a man with a gun tried to break into his house. Dustin recalled that a house belonging to a friend's parents was "shot up," and Dustin thought the shooting, calls, and attempted break-in were related to the Petitioner's case. Dustin told the police about these encounters.

On cross-examination, Dustin acknowledged that he was serving a sentence for aggravated assault and that he had prior convictions of automobile burglary, sale of schedule III drugs, and theft of property valued over $500. Dustin acknowledged that he was not able to identify the person who tried to break into his house.

The post-conviction court denied the petition. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn.

1992)).  Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact.  See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).  Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct.  See Fields, 40 S.W.3d at 458.   However, we will review the post-conviction court's conclusions of law purely de novo.  Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

The Petitioner alleges that trial counsel was ineffective by advising him not to testify at trial, by not allowing him to testify regarding his claim of self-defense, and by not presenting proof of an insanity defense based upon his mental health history and an evaluation by a defense expert.  The Petitioner also alleges that the trial court "erred by finding that [he] offered no proof of the claim of newly discovered evidence presented by co-defendant Coty Heath and his brother, Dustin Heath."

Turning to the Petitioner's claims regarding his failure to testify, we note that the post-conviction court accredited trial counsel's testimony that the Petitioner chose not to testify after trial counsel fully advised him regarding the potential problems with his testimony. The post-conviction court noted trial counsel's testimony that he told the Petitioner he would not be a good witness, particularly noting the inconsistencies in the Petitioner's various versions of events. The post-conviction court found that the Petitioner did not present testimony or other evidence to support his claim that "he was denied the right to testify on his own behalf." The record does not preponderate against these findings. See Thomas Lee Carey, Jr. v. State, No. M2018-00292-CCA-R3-PC, 2019 WL 669762, at *6 (Tenn. Crim. App. at Nashville, Feb. 19, 2019), perm. to appeal denied, (Tenn. June 19, 2019).

Regarding the Petitioner's claims concerning the insanity defense and the failure to present a psychological expert, the post-conviction court found that the Petitioner had been found competent to stand trial and that an insanity defense could not be supported. The post-conviction court accredited trial counsel's testimony that Dr. Zager's testimony would not be favorable to the Petitioner. The post-conviction court found that the Petitioner failed to present any evidence at the post-conviction hearing to demonstrate how an insanity defense "could be made or supported." The record does not preponderate against these findings. See William Arthur Shelton v. State, No. E2009-00582-CCA-R3-PC, 2009 WL 5083495, at *7 (Tenn. Crim. App. at Knoxville, Dec. 28, 2009).

Finally, concerning the Petitioner's claims of newly discovered evidence, the post-conviction court held that "allegations of newly discovered or recanted testimony are matters related to the sufficiency of the evidence and not appropriate for post-conviction relief." On appeal, the Petitioner concedes that "Tennessee courts have concluded that presenting newly discovered evidence, even challenging the sufficiency of past evidence, is not proper in Post-Conviction Hearings." We agree. This court has stated that "[r]ecanted testimony amounts to no more than a request to relitigate the sufficiency of the evidence at trial and is not a proper subject of post-conviction relief." Teresa Deion Smith Harris v. State, No. W2000-02611-CCA-R3-PC, 2001 WL 892848, at *1 (Tenn. Crim. App. at Jackson, Aug. 3, 2001). Therefore, the post-conviction court did not err by denying the Petitioner relief on this basis.

### III. Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 14 -